RENDERED: DECEMBER 8, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0529-WC

KENTUCKY INSURANCE GUARANTY ASSOCIATION          APPELLANT

PETITION FOR REVIEW OF A DECISION
v.          OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-99-60451

RODNEY NEWSOME; DR. SAI GUTTI/PAIN
MANAGEMENT CENTER; RX DEVELOPMENT;
HONORABLE JOHN B. COLEMAN, ADMINISTRATIVE
LAW JUDGE; AND WORKERS' COMPENSATION
BOARD                                                                APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ECKERLE, JONES, AND McNEILL, JUDGES.

JONES, JUDGE: Kentucky Insurance Guaranty Association (KIGA) appeals an

order of an administrative law judge (ALJ), as affirmed by the Workers'

Compensation Board (Board), which resolved a medical fee dispute it filed against

Dr. Sai Gutti/Pain Management Center (Gutti) and Rx Development (RX). Upon review, we affirm.

## I. BACKGROUND

The underlying medical fee dispute was filed by KIGA in early 2014 on behalf of its insured, Larry Mullins Trucking;[1] and against its insured's employee, Rodney Newsome, along with Newsome's medical providers, Gutti and RX. Gutti and RX operated a physician dispensary and sought reimbursement from KIGA after filling several of Newsome's prescriptions that were undisputedly covered under Newsome's workers' compensation award against Larry Mullins Trucking. KIGA filed its post-award medical fee dispute to challenge the prices Gutti and RX were billing it for those prescriptions. On December 22, 2020, the ALJ entered a final order resolving KIGA's dispute. And, as the breadth of what is set forth below tends to indicate, KIGA was disappointed with much of the ALJ's order.

KIGA's appeal raises the following issues: (1) whether the Board erred by not sanctioning Gutti and RX for filing an untimely brief at the administrative appellate level; (2) whether 803 Kentucky Administrative

---

[1] KIGA identified itself in its pleadings below as "Kentucky Insurance Guaranty Association as insurer/payment obligor for Larry Mullins Trucking," but has now shortened its moniker to simply "Kentucky Insurance Guaranty Association."

Regulation (KAR) 25:092 (1993), the now-superseded regulation[2] that governed the underlying fee disputes, required Gutti and RX to disclose their "actual acquisition costs" for the prescriptions at issue to secure reimbursement from KIGA; (3) whether the ALJ's ultimate determination regarding the applicable rate of reimbursement was supported by substantial evidence and otherwise consistent with the aforementioned regulation; and (4) whether KIGA was entitled to restitution or credit for any amount it may have over-reimbursed Gutti and RX. We will address those issues sequentially. Additional facts will be discussed in the course of our analysis.

## II. STANDARD OF REVIEW

The issues presented by the parties primarily require us to interpret statutory and regulatory provisions, which are legal issues we review *de novo*. *Saint Joseph Hosp. v. Frye*, 415 S.W.3d 631, 632 (Ky. 2013). Apart from that, our function is to correct the Board only where we perceive that it has "overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992). If the factfinder held in favor of the party with the burden of proof, the burden on appeal is only to show that substantial evidence

---

[2] While 803 KAR 25:092 was amended in 2021 and 2022, only the 1993 version of 803 KAR 25:092 is relevant to this appeal.

supported the decision. *See also Special Fund v. Francis*, 708 S.W.2d 641, 643

(Ky. 1986). Conversely, if the factfinder held against the party with the burden of

proof, that party, on appeal, must "show that the ALJ misapplied the law or that the

evidence in her favor was so overwhelming that it compelled a favorable

finding[.]" *Gray v. Trimmaster*, 173 S.W.3d 236, 241 (Ky. 2005).

### III. ANALYSIS

**1. The Board's refusal to sanction Gutti and RX for filing an untimely brief was at most harmless error.**

When Gutti and RX filed their combined responsive brief and cross-

petition for review before the Board, their brief was untimely by a margin of

roughly three months. Citing that fact, KIGA moved the Board to sanction Gutti

and RX by striking their responsive brief and dismissing their cross-petition. The

Board refused to do so but did not elaborate upon its ruling. KIGA argues the

Board erred and should be reversed in this respect.

We disagree. 803 KAR 25:010 § 22(12)[3] vests the Board with broad

discretion to sanction tardy briefs as it deems appropriate. However, there is no

---

[3] 803 KAR 25:010 § 22(12) provides: "Sanctions. Failure of a party to file a brief conforming to the requirements of this administrative regulation or failure of a party to timely file a response may be grounds for the imposition of one (1) or more of the following sanctions: (a) Affirmation or reversal of the final order; (b) Rejection of a brief that does not conform as to organization or content, with leave to refile in proper for within ten (10) days of the date returned. If timely refiling occurs, the filing shall date back to the date of the original filing; (c) Striking of an untimely response; (d) A fine of not more than $500; or (e) Dismissal."

indication that the posture of the instant appeal would have meaningfully differed even if the Board had sanctioned Gutti and RX in the manner KIGA requested. True, the Board did not dismiss Gutti's and RX's cross-petition. But, it affirmed with respect to their cross-petitio. Gutti and RX thereafter filed no appeal; and thus, as a practical matter, the same result was ultimately achieved. Furthermore, even if the Board had stricken Gutti's and RX's response to KIGA's appeal, doing so in and of itself would not have precluded the Board from reviewing KIGA's appeal on the merits – without the assistance of any responsive brief from Gutti and RX – and nevertheless affirming the ALJ as it did below.[4] In sum, even if the Board abused its discretion by failing to sanction Gutti and RX consistently with KIGA's motion, KIGA was not discernably prejudiced. Nothing more than harmless error resulted.

**2. The regulation that governed the underlying fee disputes did not require Gutti and RX to disclose their "actual acquisition costs" for the prescriptions at issue to secure reimbursement.**

On February 2, 2018, KIGA moved the ALJ to compel production of the following discovery from Gutti and RX:

> A copy of each actual invoice received and paid by IWP [sic] and/or Dr. Gutti (including any discounts, rebates, incentives, etc. that comprise the actual price paid) for each prescription it is seeking reimbursement for. In the KESA v. IWP claim, the Supreme Court established that

---

[4] Notably, in workers' compensation appeals before this Court, respondents may but are not required to file a brief. *See* Kentucky Rule of Appellate Procedure (RAP) 49(F).

-5-

the appropriate reimbursement price for pharmaceuticals shall be the actual price paid by the pharmaceutical provider plus a $5.00 dispensing fee. In order to appropriately determine the amount of the proper reimbursement to IWP [sic] and/or Dr. Gutti for the prescriptions provided, they must produce this information.

KIGA also sought an order compelling RX to produce a designated corporate spokesperson to provide testimony regarding this requested discovery, claiming that for purposes of its medical fee disputes, the "correct" pricing for the prescribed medications at issue could not be determined unless RX and Gutti disclosed the wholesale prices they had actually paid for them.

RX and Gutti objected, claiming among other grounds that KIGA was improperly seeking trade secrets from them, *i.e.*, "privileged business information as to RX Development's business operations, billings and profits"; and that in any event "[t]he issues presented are legal not factual." In resolving KIGA's motion, the ALJ refocused the issue, indicating that the dispositive question was not what RX and Gutti had actually paid for the prescriptions, but whether the amount they had billed KIGA was "outside of the pharmaceutical fee schedule" set forth in 803 KAR 25:092 (1993). The ALJ elaborated upon this point in a September 9, 2019 order overruling KIGA's motion to compel, explaining in relevant part:

> [T]he burden is on the payment obligor to make out a prima facie showing for reopening by delineating what the payment obligor believes to be the average wholesale

> price or the average-to-sell price prior to the setting of a
> proof schedule.
>
> . . .
>
> Given the fact that the payment obligor has yet to provide
> what it believes to be the average wholesale price or
> average-to-sell price for any of the contested
> medications, the objections to the motions to compel are
> sustained.
>
> . . .
>
> The defendant is obligated to pay the outstanding charges
> at what it believes to be the appropriate average
> wholesale price or average-to-sell price as there is no
> justification for withholding the entirety of the payment
> for the outstanding prescriptions which have been filled.

In other words, the ALJ held that the information KIGA sought to discover from RX and Gutti would not satisfy KIGA's initial evidentiary burden on reopening and was thus irrelevant. On appeal, KIGA argues the ALJ erred in overruling its motions to compel, claiming the discovery it requested was relevant and essential to its medical fee disputes. We disagree.

The irrelevance of what RX and Gutti actually paid for the prescriptions at issue is best illustrated through a hypothetical: Suppose RX and Gutti were able purchase *all* the prescriptions at issue from a wholesaler for *nothing*. How would this impact their right to "reimbursement"? For the answer, we turn to 803 KAR 25:092 (1993), which was operative when Gutti and RX submitted their reimbursement requests. In relevant part, it provided:

Section 1.  Definitions. . . .

. . .

(6) "Wholesale price" means the average wholesale price charged by wholesalers at a given time.

Section 2.  Payment for Pharmaceuticals.  (1) An employee entitled to receive pharmaceuticals under KRS 342.020 may request and require that a brand name drug be used in treating the employee.  Unless the prescribing practitioner has indicated that an equivalent drug product should not be substituted, an employee who requests a brand name drug shall be responsible for payment of the difference between the equivalent drug product wholesale price of the lowest priced therapeutically equivalent drug the dispensing pharmacist has in stock and the brand name drug wholesale price at the time of dispensing.

(2) Any duly licensed pharmacist dispensing pharmaceuticals pursuant to KRS Chapter 342 shall be entitled to be reimbursed in the amount of the equivalent drug product wholesale price of the lowest priced therapeutically equivalent drug the dispensing pharmacist has in stock, at the time of dispensing, plus a five (5) dollar dispensing fee plus any applicable federal or state tax or assessment.

(3) If an employee's prescription is marked "Do Not Substitute," the dispensing pharmacist shall be entitled to reimbursement in an amount equal to the brand name drug wholesale price, at the time of dispensing, plus a five (5) dollar dispensing fee plus any applicable federal or state tax or assessment.

To review, § 1(6) of this regulation provided that "'Wholesale price' means the average wholesale price charged by wholesalers at a *given time*."

(Emphasis added.)  In turn, § 2(1), (2) and (3) each specified that *given time*:

According to those provisions, the amount of reimbursement Gutti and RX were entitled to receive depended solely upon the wholesale price of the drug product they dispensed – or "the lowest priced therapeutically equivalent drug the dispensing pharmacist has in stock," whatever the case may be – "*at the time of dispensing.*"  (Emphasis added.)  Thus, if Gutti and RX paid *nothing* to acquire the drug product, but the average wholesale price charged by wholesalers for that drug product – or "the lowest priced therapeutically equivalent drug the dispensing pharmacist has in stock," whatever the case may be – was "X" at the time they dispensed it,[5] the above regulation would have entitled Gutti and RX to reimbursement in the amount of "X," in addition to "a five (5) dollar dispensing fee plus any applicable federal or state tax or assessment."  *See* §2 (2) and (3).

KIGA, in maintaining that the discovery it requested was relevant and essential to its medical fee disputes, does not discuss any of the regulatory language set forth above.  Instead, KIGA's argument appears limited to the following proposition: Knowing what RX and Gutti actually paid a wholesaler for the prescriptions at issue was relevant because our Supreme Court said so.  In support, KIGA quotes from our Supreme Court's interpretation of 803 KAR 25:092 (1993), as set forth in *Steel Creations By and Through KESA, The Kentucky*

---

[5] Undisputedly, the actual cost of a given drug product can vary on a daily basis.

*Workers' Compensation Fund v. Injured Workers Pharmacy*, 532 S.W.3d 145, 156-57 (Ky. 2017); and KIGA emphasizes that our Supreme Court's interpretation repeatedly utilized the words "actual" and "paid":

> So, how should pharmacy reimbursement rate disputes be resolved? The same way all other disputes under KRS 342 are resolved. The parties present their proof, and the ALJ makes a determination. The ALJ may, but is not required to, take into consideration the published average wholesale price. The ALJ may also take into consideration the wholesale acquisition price, which has some connection to what a wholesaler would charge a retailer. However, unless the ALJ determines that the published average wholesale price or the wholesale acquisition price is the *actual* average wholesale price the pharmacist *paid*, the ALJ may not simply adopt either of those pricing guides *in toto*.[FN]
>
> > [FN] For the sake of clarity, we are not stating that any of the pricing guides are per se admissible. Any such guide must be admissible pursuant to 803 KAR 25:010 Section 14, and the ALJ is free to exercise his or her discretion in either admitting or excluding a proffered pricing guide within the confines of that regulation. Based on the record before us in this case, it appears that the published average wholesale price guides and the wholesale acquisition price guide may not be particularly relevant. However, none of the parties have sought to introduce into evidence any of those pricing guides. If a party attempts to do so and there is an objection, the ALJ must undertake the appropriate analysis before admitting or excluding any proffered pricing guides.

The ALJ must determine the *actual* wholesale price the pharmacist *paid*, which may or may not have a relevant correlation to either the published average wholesale price or the wholesale acquisition price. Regardless, the ALJ, by exercising the discretion granted to him or her, must determine what the appropriate reimbursement rate is under the regulation.

We recognize that this could, as IWP argues, put a considerable strain on the already busy ALJs. That may or may not be the case. However, if that occurs, the Department can take the appropriate steps to remedy the situation by amending the regulation.

As to this case, the CALJ did not order KESA to reimburse IWP based on the published average wholesale price that IWP charged. He ordered KESA to reimburse IWP pursuant to the statute and regulations, which he correctly interpreted to be the actual average wholesale price IWP *paid*. However, the CALJ did not make any specific findings regarding the *actual* average wholesale price IWP *paid* for the medications it dispensed.

. . .

[T]he regulation states that reimbursement is based on what the dispensing pharmacy (IWP) *paid* for medications, not what another dispensing pharmacy (Walgreens, Kroger, Meijer, etc.) may have *paid*. Therefore, this matter must be remanded to the Department for assignment to an ALJ with instructions to make findings regarding what IWP's *actual* average wholesale price was for the medications at issue.

(Emphasis added.)

With that said, we begin with the obvious: The words "actual" and "paid" do not appear in 803 KAR 25:092 (1993). It was also never held in the

-11-

above-quoted case that reimbursement under that regulation was based upon what the pharmacist requesting reimbursement "actually paid" for the drug product; to the contrary, our Supreme Court explained that reimbursement was based upon "the actual average *wholesale price* the pharmacist paid[.]" *Injured Workers Pharmacy*, 532 S.W.3d at 156 (emphasis added). As discussed, "wholesale price" was administratively defined as what "wholesalers" (thus, wholesalers in general) were charging pharmacists on "average" for the drug product at issue or its lowest-priced therapeutic equivalent "at a given time." *See* 803 KAR 25:092 § 1(6) (1993). That "given time" – critical for ascertaining the average wholesale price for reimbursement purposes – was not when the pharmacist *paid* for the drug product at issue; it was "the time of dispensing." *See id.* at § 2(1), (2), and (3). Taken in context, our Supreme Court's statement that reimbursement was based upon "the actual average wholesale price the pharmacist paid" meant nothing more than this: The price that a pharmacist is *deemed* to have paid for a drug product, for purposes of reimbursement under 803 KAR 25:092 (1993), is the average price for which the drug product could have been purchased from a wholesaler when the pharmacist dispensed the drug product. 532 S.W.3d at 156.

Apart from that, two other salient points about *Injured Workers Pharmacy*, *id.*, underscore that what the pharmacist requesting reimbursement *actually paid* is irrelevant. First, our Supreme Court emphasized – at length in

-12-

what is quoted above – that an ALJ may resort to general pricing guides to ascertain the applicable "wholesale price." Second, the pharmacists requesting reimbursement in *Injured Workers Pharmacy* similarly never divulged what they actually paid for their dispensed drug products. *Id*. at 152. To be sure, our Supreme Court ultimately vacated and remanded that matter for the ALJ to "determine what [the pharmacist's] actual average wholesale price was for the contested medications." *Id*. at 158. But, our Supreme Court did not require the ALJ to "reopen proof" to make that determination – tacitly indicating that no proof of what the pharmacist actually paid was required. *Id*. In short, the ALJ and Board committed no error in this respect.

**3. The ALJ's ultimate determination regarding the applicable rate of reimbursement was supported by substantial evidence and otherwise consistent with 803 KAR 25:092 (1993).**

KIGA begins this part of its appeal by arguing the Board incorrectly stated in its affirming opinion that "KIGA did not present any evidence setting forth the amounts it believed appropriate under the fee schedule." KIGA is correct that, to the contrary, it did eventually present this type of evidence. Moreover, the evidence it eventually presented was, by all measures, substantial. Specifically, it submitted an October 8, 2019 report from a pharmo-economics expert, Dr. T. Joseph Mattingly, II, that provided several different estimates, based upon several

different sources and methodologies, of the average wholesale prices applicable to

each of the various prescriptions at issue during the relevant time frames.

In his dispositive order, the ALJ began his summary of Dr.

Mattingly's report as follows:

> The report included clear definitions of terms such as average wholesale price (AWP), national average drug acquisition cost (NADAC) and wholesale acquisition costs (WAC). The AWP is defined as an estimate of the price retail pharmacies pay when purchasing from a wholesale distributor. The NADAC is a drug cost calculation developed through a national sample of drug acquisition cost estimated by CMS[6] using actual pharmacy invoices representing what the pharmacist paid to the wholesaler from the previous 30 days. The WAC represents the manufacturer's "list price" for a drug to wholesalers or other direct purchasers that does not include discounts or rebates.
>
> He provided an explanatory diagram depicting a manufacturer charging a wholesaler by utilizing the WAC of $100.00. The wholesaler then sells to the pharmacy utilizing the AWP of $120.00. The pharmacy then sells to the patient utilizing the usual and customary charge plus a dispensing fee for $150.00. Along each step in the supply chain, the charge is increased.
>
> He provided documentation regarding the gross profits of independent pharmacy operations between 2017 and 2018 to include the difference between cost of goods sold and sales. The cost of goods sold range between 76% and 77.9% of the sales. Gross profits range between 22.1% and 24%. He went on to explain that AWP is not defined federally, but is instead a list of drug prices published in commercial publications such as Medi-Span,

---

[6] Centers for Medicare and Medicaid Services.

First Data Bank and Redbook. He noted that sometimes the AWP is supplied by the drug manufacturer (e.g. Pfizer, Merck) to the companies by calling it the suggested wholesale price (SWP). The AWP is then estimated by multiplying the WAC by 1.2 to assess a standard 20% markup.

He noted that Kentucky Medicaid reimburses at the lowest of NADAC, WAC, the federal upper limit, maximum allowable costs or usual and customary price.

Gutti's and RX's reimbursement requests at issue below were made between 2013 and 2019, and were made pursuant to 803 KAR 25:092 § 2(2) (1993). KIGA paid Gutti and RX the full amount of each billing until December 31, 2018. Shortly after that date, KIGA reduced its payments to what it believed the regulation permitted it to pay Gutti and RX instead, *i.e.*, an amount equivalent to "M. Joseph pricing."[7] KIGA, for its part, asserted that what it paid Gutti and RX *before* December 31, 2018, had been grossly in excess of what it should have paid under a proper application of the regulation. Gutti and RX, on the other hand, claimed that what KIGA paid them *after* December 31, 2018, was insufficient. With that in mind, the ALJ summarized Dr. Mattingly's opinion regarding KIGA's

---

[7] During the pendency of its medical fee dispute, KIGA had an arrangement with M. Joseph Medical, a company that specializes in helping workers' compensation payment obligors such as KIGA establish prices with prescription drug suppliers. Under this arrangement, M. Joseph negotiates with pharmacy benefits managers ("PBMs") to secure prices and terms with various pharmacies. KIGA pays M. Joseph for the prescription drugs, M. Joseph pays the PBMs, and the PBMs pay the pharmacies. This arrangement supposedly allowed KIGA to secure prescription drugs at a lower price than what was required by the workers' compensation regulatory fee schedule set forth in 803 KAR 25:092 (1993).

dispute over Newsome's medical fees – relative to what KIGA paid Gutti and RX

*after* December 31, 2018 – as follows:

> Of the outstanding charges for covered prescriptions, which had not been reimbursed in full, Zantac was billed at the rate of $102.96 and KIGA paid $25.01. The NADAC was $3.37, the WAC was $4.50 and the Redbook wholesale price was $102.96. Neurontin was billed at $47.86 and paid at the rate of $19.57. The NADAC was $2.71, the WAC was $5.40 and the Redbook wholesale price was $47.86. For Terocin patch, the provider billed $1,455.00 and KIGA paid $886.38. The NADAC was $1,212.48, the WAC was $1,212.48 and the Redbook wholesale price was $1,455.00.

Discussing and applying the regulation and the substance of our

Supreme Court's holding in *Injured Workers Pharmacy*, the ALJ then explained:

> [O]n the issue of reimbursement, the ALJ must look at the actual wholesale price paid, which may or may not have a relevant correlation to either the published average wholesale acquisition price or the wholesale acquisition price. The ALJ must exercise the discretion granted to him or her to determine what the appropriate reimbursement rate is under the regulation. The court noted the ALJ might not simply adopt either the AWP or the wholesale acquisition price paid by a pharmacist. The court went on to state that KESA could not unilaterally impose its M. Joseph agreement on IWP.

> A review of the entirety of the evidence, not only as summarized above, but as contained in the entire record, reveals the medical provider was utilizing the wholesale price closely resembling that published by Redbook. Dr. Mattingly explained that publications such as Redbook publish the AWP price, which he explained was jokingly

referred to as "ain't what's paid." Rosalie Ferris[8] explained the AWP in publications such as Redbook do not include rebates obtained in purchasing. She explained the use of PBMs allowed KIGA to obtain additional discounts so that pharmaceuticals could be purchased at levels below AWP or the average-to-sell price.

Based upon the information contained in the report of Dr. Mattingly, I am convinced the method for determining the reimbursable amount under the Kentucky schedule of fees is to utilize the WAC multiplied by 1.2, which is then added to the $5.00 dispensary fee per prescription. The method takes into account the standard industry markup of 20% from the manufacturer to the wholesaler. The WAC represents the wholesale acquisition costs as published by each pharmaceutical company at a point in time. I find it is more appropriate to use the WAC rather than the NADAC, which is determined after the fact by looking backward at amounts paid for acquisition, inclusive of discounts. Utilization of the NADAC would be completely unworkable as the pharmacy or dispensary would be unable to determine the NADAC amount at the time the medication is dispensed, as the information is based upon a future determination.

. . .

The Supreme Court made it clear that KIGA cannot impose M. Joseph pricing on the medical provider. Further pricing, which is "customary under the fee schedule for the medications paid to other local pharmacies" is not the requirement of 803 KAR 25:092, Section 2(2), which allows reimbursement at the wholesale price of the lowest priced therapeutically equivalent drug the dispensing pharmacist has in stock, at the time of dispensing, plus a five dollar dispensing fee,

---

[8] Rosalie Faris provided expert testimony below regarding drug pricing. At that time, she was a registered nurse and Vice President of Managed Care for Occupational Managed Care Alliance.

-17-

along with taxes.  KIGA's request to reimburse with M. Joseph pricing or pricing paid to other local pharmacies is simply an attempt to provide KIGA the benefit of lower prices negotiated by their PBMs, which were not negotiated with the pharmacy in question.  It has little to do with the average wholesale price, which must be reimbursed.  Instead, I am directed to look at the acquisition costs and the published wholesale pricing to make a determination as to the reimbursable amounts while utilizing my discretion.

Dr. Mattingly has provided us with the information necessary to determine the amount owed.  KIGA requested allowance to make payment as if they were doing so under the Kentucky Medicaid schedule.  However, this is not a Medicaid claim, but is instead a workers' compensation claim governed by KRS Chapter 342.  Dr. Mattingly has provided average acquisition costs and the wholesale acquisition costs for each of the medications in question.  Those amounts are set forth in the summary of evidence.  Dr. Mattingly explained that each step of the supply chain has a markup, which is generally 20%, in addition to a dispensary fee.  Here, the acquisition costs can best be determined by utilizing the WAC, which provides the listed wholesale price for a drug to a wholesaler or other direct purchaser.  It does not include discounts, which may be negotiated by a PBM or available under KIGA's current managed care plan.  However, they do not enjoy the benefit of those discounts across the board.  To allow KIGA the benefit of implied discounts would have the effect of imposing the Medicaid rule on workers' compensation providers.

The ALJ then resolved the underlying fee dispute – relative to what KIGA paid Gutti and RX *after* December 31, 2018 – by applying the WAC method for ascertaining wholesale prices as set forth in Dr. Mattingly's report:

Therefore, I find the acquisition cost for the medications dispensed on December 31, 2018 to be $1,222.38, by utilizing the WAC set forth in Appendix II of Dr. Mattingly's report. The amount billed by the medical provider is the amount published as the average wholesale price without consideration of likely discounts. The defendant requests the ALJ interpret the Injured Worker's Pharmacy case to mean the provider can only charge a $5.00 dispensary fee above the wholesale acquisition costs. However, this is not my interpretation. Instead, I interpret the case to mean I must utilize the acquisition costs and the published wholesale prices to determine the amount available for reimbursement under the regulation, to include the $5.00 dispensary fee.

In this instance, the testimony of Rosalie Ferris indicates the bills were paid at 30% below what would typically be the average wholesale price and the opinion of Dr. Mattingly would indicate the acquisition price or WAC would be multiplied by 1.2 to obtain the average wholesale price for a standard markup when explaining that each step in the supply chain has a standard markup. The $1,222.38 acquisition cost multiplied by 1.2 reveals an average wholesale price of $1,466.86, which is below the amount billed by the provider, but above the amount paid by KIGA. KIGA paid $930.96, which leaves $535.90 owing to the medical provider in addition to a $15.00 dispensary charge. Therefore, the balance due is $550.90.

On appeal, KIGA emphasizes in its brief that "Dr. Mattingly's report clearly explains that NADAC provides the most appropriate estimate" for determining the average wholesale price applicable to drug products, and that it made "very clear in all of its briefs that it is of the position that NADAC must serve as the benchmark for determining what [Gutti and RX were] charged for the

-19-

medications at issue." But, KIGA stops short of arguing that the methodology selected by the ALJ was unsupported by substantial evidence or otherwise inconsistent with 803 KAR 25:092 § 2(2) (1993).

Regardless, while the ALJ did not select the methodology favored by Dr. Mattingly, the ALJ did select a methodology Dr. Mattingly acknowledged as a recognized means of ascertaining the applicable wholesale price of prescriptions, and the ALJ provided a reasonable explanation for doing so. The ALJ may choose not only which expert to believe, but also what parts of the evidence or witness's testimony to believe or disbelieve. *See Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15 (Ky. 1977). Furthermore, the ALJ's analysis was consistent with the operative regulation and *Injured Workers Pharmacy*. Accordingly, to the extent KIGA is suggesting this aspect of the ALJ's order was erroneous, its suggestion lacks merit.

**4. KIGA was not entitled to restitution or a credit for any amount it may have over-reimbursed Gutti and RX.**

The ALJ did not resolve the merits of KIGA's medical fee dispute insofar as it concerned what KIGA may have overpaid Gutti and RX *before* December 31, 2018. Essentially, the ALJ held that this aspect of KIGA's medical fee dispute was moot because he lacked authority under the circumstances to either order Gutti and RX to refund any overpayment to KIGA, or to grant KIGA any kind of offsetting credit against what remained outstanding. The Board affirmed.

-20-

On appeal, KIGA maintains the ALJ erred in denying this aspect of its medical fee dispute because, in its view, the ALJ was either: (1) estopped from denying it reimbursement or a credit; or (2) authorized to grant it that relief.

We disagree. Regarding its first argument, the ALJ could not have granted KIGA relief based solely on equity or a common law principle such as estoppel. Rather, the ALJ was required to find, within the ambit of the Workers' Compensation Act, warrant for the exercise of any authority he could have claimed. *See Dep't for Nat. Res. and Envt'l Prot. v. Stearns Coal & Lumber Co.*, 563 S.W.2d 471, 473 (Ky. 1978). "Workers' compensation is a creature of statute, and the remedies and procedures described therein are exclusive." *Williams v. Eastern Coal Corp.*, 952 S.W.2d 696, 698 (Ky. 1997).

Before leaving this point, we pause to note that much of KIGA's estoppel argument is based upon what KIGA believes was the *ALJ's* inequitable conduct during the proceedings below. Specifically, KIGA notes that in June 2014, near the beginning of its underlying medical fee dispute, it filed a motion for interlocutory relief asserting that it would suffer irreparable harm "if it were required to pay [Gutti's and RX's] inflated prices"; and that in a July 29, 2014 order, the ALJ denied its motion, stating as follows:

> After a review of the motion, same is hereby overruled as there is no showing the defendant will suffer irreparable harm during the proceedings. The defendant shall pay the outstanding charges pursuant to the current medical

fee schedule. *Any issue of overpayment can be dealt with at the conclusion of the claim.*

(Emphasis added.)

KIGA asserts it reasonably interpreted the above-emphasized language of the ALJ's order to mean that any overpayment it thereafter made to Gutti and RX would be reimbursed at the conclusion of the proceedings; that in reliance upon this language, it then reimbursed the full amount of each invoice Gutti and RX thereafter submitted to it until after December 31, 2018; and that when the ALJ ultimately did not direct Gutti and RX to reimburse any of its alleged overpayments "at the conclusion of the claim," the ALJ effectively went back on his word.

There are at least two flaws in that proposition, both of which emanate from KIGA's misreading of the ALJ's order. First, the ALJ only required KIGA to pay Gutti and RX "pursuant to the current medical fee schedule," not the full amount of Gutti's and RX's invoices. Second, the ALJ stated that "Any issue of overpayment can be dealt with at the conclusion of the claim" – not that any overpayment would be refunded at the conclusion of the claim, irrespective of the legislative constraints on the ALJ's authority.

This leads to KIGA's second argument. KIGA contends that two statutory provisions – by themselves or in conjunction with one another – authorized the ALJ to grant it restitution representing its alleged overpayments.

The first provision is KRS 342.990(11), which KIGA asserts "allows for restitution to be ordered by an ALJ, <u>without any showing of misconduct</u>." (KIGA's emphasis.) However, KIGA's assertion ignores the plain language of that provision. KRS 342.990(11) states in relevant part that "any administrative law judge . . . may order restitution of a benefit secured through conduct *proscribed* by this chapter." (Emphasis added.) Unless KIGA overpaid for prescriptions because Gutti and RX engaged in conduct forbidden or prohibited[9] by KRS Chapter 342, KRS 342.990(11) could not have authorized restitution.

The second provision of KRS Chapter 342 that KIGA relies upon is KRS 342.035(2), which states in relevant part:

> No provider of medical services or treatment required by this chapter, its agent, servant, employee, assignee, employer, or independent contractor acting on behalf of any medical provider, shall *knowingly* collect, attempt to collect, coerce, or attempt to coerce, directly or indirectly, the payment of any charge, for services covered by a workers' compensation insurance plan for the treatment of a work-related injury or occupational disease, in excess of that provided by a schedule of fees, or cause the credit of any employee to be impaired by reason of the employee's failure or refusal to pay the excess charge. . . .

(Emphasis added.)

---

[9] *See, e.g.*, BLACK'S LAW DICTIONARY 1236 (7th ed. 1999) (defining "proscribe" as "To outlaw or prohibit; to forbid.").

However, the ALJ held that Gutti and RX did not engage in conduct forbidden or prohibited by KRS 342.035(2), and that restitution or reimbursement therefore could not be ordered through KRS 342.990(11). In that regard, the ALJ explained:

> Given the fact the medical provider relied on a trusted publication (Redbook) to determine pharmaceutical charges, I find the medical provider did not *knowingly* collect, attempt to collect, coerce, or attempt to coerce, directly or indirectly, the payment of any charge, for services covered by workers' compensation in excess of that provided by the medical schedule of fees.
> .

(Emphasis added.)

KIGA maintains that KRS 342.035(2) permitted the ALJ to award it restitution for any amount it may have overpaid Gutti and RX. But, KIGA fails to address the ALJ's finding that Gutti and RX lacked the requisite *mens rea* and thus did not violate that provision. KIGA has accordingly conceded that this part of the ALJ's judgment was correct. *See, e.g.*, *Osborne v. Payne*, 31 S.W.3d 911, 916 (Ky. 2000) ("Any part of a judgment appealed from that is not briefed is affirmed as being confessed.").

Lastly, KIGA insists that two published cases indicate it should have been granted reimbursement under the circumstances of this case. The first of these cases is *Yocum v. Travelers Ins. Co.*, 502 S.W.2d 520 (Ky. 1973). However, if KIGA is citing *Yocum* for the proposition that specific statutory authorization for

-24-

reimbursement is unnecessary, *Yocum* undermines KIGA's position. There, the employer voluntarily paid income benefits for which the Special Fund was ultimately held liable. The Special Fund argued that it was not required to reimburse the employer because the payments made by the employer were voluntary, and also because the "old" Board had not expressly provided for reimbursement of the employer by the Special Fund in its decision. The Special Fund's argument was rejected by our former High Court, however, because "reimbursement [was] required by KRS 342.120(4)[.]" *Id*. at 522.

The second case KIGA cites is *Triangle Insulation and Sheet Metal Co. v. Stratemeyer*, 782 S.W.2d 628 (Ky. 1990). There, our Supreme Court held an employer is allowed a dollar-for-dollar credit for past temporary total disability ("TTD") benefits where the employer voluntarily pays an injured employee prior to a workers' compensation award. It further explained:

> It is important to encourage employers to make voluntary payments to injured employees. Employers are not obligated to pay benefits until a claim has been litigated and an award entered. Such payments are voluntary. The circumstances involved in each specific case must be carefully evaluated so that the employee is not unduly harmed and the employer is encouraged to make voluntary payments.

*Id*. at 630.

However, the case at bar did not involve a circumstance where an employer, prior to the entry of an award, voluntarily paid benefits to an injured

-25-

employee. Rather, it involved an obligor, KIGA, contesting post-award medical expenses. And in that circumstance, KIGA did not have the luxury of a voluntary choice, but rather faced a binary one: Either pay the bills within the time allotted by statute; or reopen the underlying award, shoulder the burden of contesting the appropriateness of the bill, and risk sanctions if its contest is deemed frivolous. *See Kentucky Associated Gen. Contractors Self-Ins. Fund v. Lowther*, 330 S.W.3d 456, 459 (Ky. 2010).

Because KIGA was not entitled to be reimbursed any amount, it follows that KIGA was not entitled to indirect reimbursement through a credit or offset, either; indeed, KIGA cites no statutory authority to the contrary, and we are aware of none. The ALJ committed no error in this respect.

## IV. CONCLUSION

When it affirmed the ALJ's underlying order, the Board did not overlook or misconstrue controlling statutes or precedent, or commit an error in assessing the evidence so flagrant as to cause gross injustice. *See Kelly*, 827 S.W.2d at 687-88. Thus, we likewise AFFIRM.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEES DR. SAI GUTTI/PAIN MANAGEMENT CENTER AND RX DEVELOPMENT: |
|---|---|
| Christopher M. Mayer<br>Thomas L. Ferreri<br>Louisville, Kentucky | |
| | Ched Jennings<br>Louisville, Kentucky |